IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC, | |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| LOYAL TRUCKING, LLC, COREY STULL, RANAE MUENCHRATH, | |
| Defendants. | |

COMES NOW Plaintiff Jim Daws Trucking, LLC and, for its Complaint against Loyal Trucking, LLC, Corey Stull, and RaNae Muenchrath, alleges as follows:

## PARTIES

1. Plaintiff Jim Daws Trucking, LLC (JDT) is a Nebraska limited liability company whose members, Ricardo Fernandez (Rick) and Ricardo Daniel Fernandez (Ricky), are residents of Illinois.

2. Defendant Loyal Trucking, LLC (Loyal Trucking) is a Nebraska limited liability company with its principal place of business at 758 280th Rd., Milford, Nebraska.

3. Defendant Corey Stull (Stull) is a resident of Nebraska and a member of Loyal Trucking.

4. Defendant RaNae Muenchrath (Muenchrath) is a resident of Nebraska and a member of Loyal Trucking.

5.    Up until at least November 1, 2024, James Daws (Jim) was also a member of Loyal Trucking.

<strong>JURISDICTION & VENUE</strong>

6.    This Court has jurisdiction of this matter pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331, in that JDT's Second Cause of Action arises under federal law, and pursuant to 28 U.S.C. § 1332(a)(1), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), in that this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

<strong>FACTS</strong>

**A.    JDT purchases Daws Trucking as a going concern.**

8.    On May 4, 2022, JDT signed an Asset Purchase Agreement (the APA) with Daws, Inc., Jim and Lana Daws (Lana), pursuant to which Daws, Inc. sold its business known as Daws Trucking, including all its tangible and intangible assets, to JDT as a going concern.

9.    The owners of Daws, Inc. are Jim and Lana, who are husband and wife. Jim and Lana signed the APA in their individual capacities, agreeing in pertinent part that they "shall not, either directly or indirectly, carry on or engage in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of [the APA] . . . ."

2

**B.      The assets purchased by JDT included proprietary information.**

10.      Among the intangible assets purchased by JDT were the customer lists and pricing information for each customer, which were the proprietary information of Daws Trucking and JDT.

11.      The customer list and pricing information derive independent economic value from not being generally known or readily ascertainable through proper means by others who can obtain economic value from their disclosure or use and were the subject of reasonable efforts to maintain their secrecy.

12.      Employees of Daws Trucking, including Stull and Muenchrath, required to sign an employee handbook which informed employees they were required to maintain the confidentiality of Daws Trucking's trade secrets and other confidential information, including financial data and "[a]ny information that will or could provide any advantage or assistance to the Company's competitors."

13.      As longtime employees of Daws Trucking, Jim, Stull, and Muenchrath were aware that JDT's customer list and pricing information were valuable and not to be shared outside the company.

14.      In sworn testimony, Jim has admitted JDT's customer list and the pricing information for each customer were proprietary.

**C.      Stull and Muenchrath quit JDT as part of a mass resignation coordinated by Jim.**

15.      Jim stayed on with Daws Trucking as an employee of JDT after the sale, effectively serving as chief executive officer of the business and filing a biennial report in 2023 listing himself as president of the company.

3

16. Stull and Muenchrath also stayed on as employees of JDT after execution of the APA.

17. In the summer and early fall of 2024, Jim attempted to negotiate a buyback of the business of Daws Trucking from JDT. When Rick proposed a number higher than Jim thought the company was worth without him, Jim said he would resign from JDT and that he expected most of JDT's employees would leave with him. Jim later resigned effective September 30, 2024, and coordinated a mass resignation of most of JDT's employees on September 27, 2024.

18. Stull and Muenchrath were among the employees who resigned in coordination with Jim on September 27, 2024.

19. On October 2, 2024, JDT sued Daws, Inc., Jim, Lana, and others, alleging breach of fiduciary duty by Jim and breach of the noncompete agreement in the APA. Stull and Muencrath were aware of the litigation.

**D. Stull and Muenchrath conspire with Jim and Lana.**

20. In October of 2024, despite their knowledge of Jim's role within JDT and the suit filed against him by JDT, Stull and Muenchrath engaged in personal and electronic communications with Jim, Lana, and others, in a coordinated effort to continue the business of Daws Trucking in competition with JDT, with the same core group of employees, drivers, and customers that were part of the Daws Trucking business that had been purchased by JDT. Their actions included but were not limited to the following:

4

a.    Meeting with Jim and Lana in their home to discuss carrying on the business of Daws Trucking outside JDT and in competition with JDT.

b.    Communicating with JDT customers for the purpose of carrying on the business of Daws Trucking in competition with JDT.

c.    Dispatching drivers to haul loads for JDT customers in competition with JDT.

d.    Encouraging former JDT drivers not to drive for JDT, offering to pay and in fact paying drivers to stay home, and encouraging drivers to make complaints about JDT to JDT and to government regulators.

e.    Sourcing flatbed trailers to be used by Loyal Trucking and others in competition with JDT.

f.    Arranging with refrigerated carriers so that former JDT drivers could haul loads for them while plans to haul flatbed freight were taking shape, thus simultaneously depriving JDT of drivers needed to generate revenue and maintaining the loyalty of drivers who would later drive for Loyal Trucking.

21.    On October 23, 2024, as evidenced by the following text exchange, Jim (phone number ending in 5432) collaborated with Stull and Muenchrath in an effort to activate Loyal Trucking's United States Department of Transportation (DOT) number to haul flatbed freight in competition with JDT:

5



22.    Jim sent the texts above while he was still a member of Loyal Trucking and while bound by his noncompete agreement with JDT.

23.    The members of Loyal Trucking—Jim, Stull, and Muenchrath—acted to carry on the business of Daws Trucking in continuation of what Jim and Lana started while Jim was still employed by JDT and which continued in violation of Jim and Lana's obligations under the noncompete agreement.

24.    That same month, Jim or Loyal Trucking engaged an attorney, Julie Karavas, to prepare a redemption agreement pursuant to which Loyal Trucking would buy out Jim's interest in the business. The redemption agreement was executed on October 29, 2024, effective November 1, 2024, and structured so that Loyal Trucking was required to make a down payment of $10,000

6

immediately and to begin making annual installment payments under a promissory note beginning June 1, 2025.

25. The redemption agreement was structured to enable Loyal Trucking to compete with JDT. Because of the noncompete agreement, Loyal Trucking needed to buy out Jim if it was to engage in the business of trucking in the continental United States. But if Loyal Trucking redeemed Jim's investment on November 1, 2024, it would have needed to sell assets, including trucks, to pay Jim what it owed him, and it would not have had the capital it needed to buy trailers and operate a flatbed trucking business in competition with JDT. Thus, Defendants and their attorneys structured the settlement agreement to leave Jim's investment in the company and push back Loyal Trucking's obligation to buy Jim out. Jim did not even cash the $10,000 check from Loyal Trucking until February of 2025, because Loyal Trucking needed the money to compete with JDT.

26. At approximately the same time as the redemption agreement was prepared and executed, Jim, Lana, Stull, and Muenchrath collaborated on a business plan for Loyal Trucking. The plan was submitted to an insurance broker so that Loyal Trucking could obtain insurance to haul flatbed freight.

27. Lana emailed the broker a draft of the plan on October 29, 2024, and Jaisa Douty, a former employee of JDT who also left JDT with Jim, emailed a final version of the plan to the broker on October 31, 2024. The final version stated Loyal Trucking "will be a customer-oriented carrier that will provide over the road flatbed trucking for all 48 continental United States," with an

"established customer base needing Loyal's expertise in moving freight," "experienced drivers," and "experienced office and shop personnel." These were largely the same customers, drivers, and employees who had been with Daws Trucking and JDT.

28. In the business plan submitted on October 31, 2024, and dated November 1, 2024, Loyal Trucking stated, "Financial projections for the first year of operation are $10 million."

**E.    Stull and Muenchrath operate Loyal Trucking with assistance from Jim and with JDT's proprietary customer list and pricing data.**

29. On October 31, 2024, the United States District Court for the District of Nebraska entered a temporary restraining order (TRO) prohibiting Jim from engaging in the business of trucking based on Jim's obligations under the non-compete agreement he signed in the APA.

30. Stull and Muencrath were informed of the TRO, which they referred to as a "gag" order. Yet, as evidenced by phone records and text messages, they continued to communicate with Jim about the business of Loyal Trucking and to direct their bankers to communicate with Jim in connection with their efforts to secure financing for Loyal Trucking's purchase of flatbed trailers.

31. Jim also provided additional financial assistance to Loyal Trucking in the form of a $50,000 prepayment of property insurance premiums, which Loyal Trucking, Stull, and Muenchrath accepted and in providing advice and other assistance related to third-party financing.

32.    Loyal Trucking would not have been able to run flatbed freight after October 1, 2024, had it not been for Jim's advice, assistance, reputation, and financial support.

33.    Loyal Trucking continued to use the capital Jim contributed to its company to carry on a flatbed trucking business until at least April 17, 2025, when it claims another investor supplied the funds to buy out Jim. On information and belief, Jim arranged for that investment in Loyal Trucking as well. Loyal Trucking has continued in operation since that date.

**F.    Defendants' actions have harmed and continue to harm JDT.**

34.    Defendants have carried out the business plan for Loyal Trucking they submitted to Loyal Trucking's insurance broker by running flatbed freight, in interstate commerce, for the "established customer base" protected by JDT's proprietary customer lists and pricing data. In doing so, Loyal Trucking has taken revenue from JDT and generated significant revenue for itself.

35.    Loyal Trucking's operations have caused financial harm to JDT by depriving JDT of revenue from the "established customer base" referred to in Loyal Trucking's business plan, which had been JDT's customer base; by depriving JDT of drivers needed to generate revenue; and by depriving JDT of goodwill it purchased in the APA.

36.    At a minimum, Defendants' actions have contributed to a loss of the value of JDT's investment in the business of Daws Trucking and lost profits in the amount of $10,000,000.

37.    Defendants' operation of Loyal Trucking's business in competition with JDT, using JDT's proprietary customer and pricing information, continues to cause irreparable harm to JDT.

**FIRST CAUSE OF ACTION**
**TORTIOUS INTERFERENCE – AGAINST ALL DEFENDANTS**

38.    JDT incorporates the allegations above as if fully set forth herein.

39.    JDT had a reasonable business expectancy that Jim and Lana would abide by their noncompete obligations in the APA, that Jim would not breach his fiduciary duty as chief executive of JDT, and that Stull and Muenchrath would abide by their obligations to maintain the secrecy of JDT's proprietary customer and pricing information.

40.    JDT also had a reasonable expectancy that it would be able to maintain relationships with customers, drivers, and employees free from direct or indirect interference by Jim and companies in which he was an owner or other participant, including Loyal Trucking.

41.    Defendants Loyal Trucking, Stull, and Muenchrath interfered with JDT's business relationships and expectancy intentionally and without justification, by participating with Jim in the violation of his fiduciary duties and with Jim and Lana in their violations of their noncompete obligations, and by misappropriating JDT's proprietary customer and pricing information, with the effect that JDT lost customers, drivers, revenue, and goodwill.

42.    Defendants' actions have caused and continue to cause JDT to suffer irreparable harm and damages in the amount of at least $10,000,000.

10

## SECOND CAUSE OF ACTION
## FEDERAL DEFEND TRADE SECRETS ACT – AGAINST ALL DEFENDANTS

43.    JDT incorporates the allegations above as if fully set forth herein.

44.    JDT's proprietary customer list and pricing information are trade secrets belonging to JDT protected under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

45.    As former employees of JDT, Jim, Stull and Muenchrath had a duty to maintain the secrecy of JDT's customer list and pricing information.

46.    Jim and Lana had further duties not to transmit or use JDT's proprietary customer list and pricing information as the result of Jim's fiduciary duty to JDT and Jim and Lana's noncompete agreement.

47.    Stull, Muenchrath, and Loyal Trucking all knew or had reason to know that the customer list and pricing information were proprietary and subject to duties to maintain their secrecy.

48.    Loyal Trucking nonetheless used JDT's proprietary customer list and pricing information in its own business, in interstate commerce, by serving the same customer base as Daws Trucking, using JDT's proprietary customer list and pricing information, without the consent of JDT.

49.    As a result of this misappropriation of JDT's trade secrets, JDT has suffered irreparable harm and damages in the amount of at least $10,000,000.

50.    The actions of Defendants Loyal Trucking, Stull, and Muenchrath in misappropriating JDT's trade secrets were willful and malicious, subjecting them to exemplary damages and an obligation to pay JDT's reasonable attorney's fees.

11

**THIRD CAUSE OF ACTION**
**CIVIL CONSPIRACY – AGAINST STULL AND MUENCHRATH**

51.    JDT incorporates the allegations above as if fully set forth herein.

52.    Defendants Stull and Muenchrath entered into an agreement with Jim and Lana to compete with JDT in violation of Jim's fiduciary duty to JDT and in violation of Jim and Lana's noncompete obligations under the APA and acted to carry out that agreement.

53.    Defendants Stull and Muenchrath combined to accomplish this objective through concerted action, including by operating Loyal Trucking in violation of Jim and Lana's noncompete obligations and by using the confidential and proprietary information of JDT.

54.    Defendants Stull and Muenchrath's actions in pursuance of their agreement with Jim and Lana have caused, and continue to cause, JDT to suffer irreparable harm and damages in the amount of at least $10,000,000.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT – AGAINST LOYAL TRUCKING**

55.    JDT incorporates the allegations above as if fully set forth herein.

56.    Loyal Trucking received the financial benefit of the use of JDT's confidential customer list and pricing information, *i.e.,* the "established customer base" referred to in the business plan Loyal Trucking prepared and executed.

57.    Loyal Trucking received this financial benefit at the expense of JDT.

58.    It would be unjust for Loyal Trucking to retain this benefit.

12

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff JDT requests the Court to enter judgment in its favor and against Defendants:

A.     Awarding JDT compensatory damages in an amount to be proven at trial but at least $10,000,000.

B.     Entering preliminary and permanent injunctions prohibiting Defendants from engaging in further competition with JDT.

C.     Awarding JDT twice the amount of its compensatory damages as exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

D.     Awarding JDT its reasonable attorney's fees and expenses incurred in this action pursuant to 18 U.S.C. § 1836(b)(3)(D).

E.     Granting such other relief as the Court may deem just or equitable.

Dated July 18, 2025

JIM DAWS TRUCKING, LLC, Plaintiff

By:     s/ Andre R. Barry
Andre R. Barry # 22505
Henry L. Wiedrich # 23696
Madeline C. Hasley # 27870
CLINE WILLIAMS WRIGHT
JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 US Bank Building
Lincoln, NE 68508
Phone: (402) 474-6900
abarry@clinewilliams.com
hwiedrich@clinewilliams.com
mhasley@clinewilliams.com

## REQUEST FOR PLACE OF TRIAL

Plaintiff Jim Daws Trucking, LLC, requests Lincoln as the place of trial.

s/ Andre R. Barry
Andre R. Barry

4920-8419-3110, v. 3